# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ROUMANN CONSULTING INC. and
RONALD ROUSSE,
                    **Plaintiffs,**

      **v.**                                              **Case No. 18-C-1551**

SYMBIONT CONSTRUCTION, INC., et al.,
                    **Defendants.**

## DECISION AND ORDER

The plaintiffs, Roumann Consulting Inc. and Ronald Rousse, previously filed a civil action in this court against an entity called T.V. John & Son, Inc. ("TVJ"), alleging breach of contract and related claims. *See* E.D. Wis. Case No. 17-C-1407. That action is pending before me. After I denied the plaintiffs' motion to file a second amended complaint in the that case, the plaintiffs commenced this action against Symbiont Construction, Inc. (which is alleged to be the new name of T.V. John & Son, Inc.), two of its corporate affiliates (which are alleged to be alter egos of Symbiont Construction, Inc.), and four of the company's owners and managers. For the most part, in this action, the plaintiffs allege the same claims against the Symbiont defendants as they allege against TVJ in the first-filed action. Although the plaintiffs also allege several new claims, nearly all of them arise out of the same facts as the claims alleged in the first-filed action.

The defendants have moved, under Federal Rule of Civil Procedure 12(b)(6), to dismiss this action on the ground of "claim splitting." This ground, which is related to claim preclusion (also known as *res judicata*) but is distinct from that doctrine, allows a

federal court, in the exercise of its discretion, to dismiss a suit that is duplicative of another pending federal suit. In a nutshell, the doctrine of claim splitting applies when the first suit would preclude the second suit but for the fact that no final judgment has been entered in the first suit. *See Katz v. Gerardi*, 655 F.3d 1212, 1217–19 (10th Cir. 2011). The defendants also contend that, to the extent certain claims in the second suit are new, they should be dismissed on the merits. I consider these matters below.

## I. BACKGROUND

According to the allegations of the complaint in this action, which I accept as true for purposes of this motion, Roumann Consulting is a Canadian company that provides bidding and management services for construction projects. Ronald Rousse, a citizen of Canada, is Roumann's sole owner. Defendant Symbiont Construction, Inc., is a construction general contracting firm that was formerly known as T.V. John & Son, Inc. Compl. ¶ 8.[1] The plaintiffs allege that defendants Symbiont Holding Company, Inc., and Symbiont Science, Engineering, and Construction, Inc., although incorporated as distinct legal entities from Symbiont Construction, are in fact alter egos of Symbiont Construction and each other and therefore should have their separate corporate identities disregarded. *See id.* ¶ 88. The plaintiffs also allege that the four individual defendants—Thomas Bachman, Sonya Simon, Edward Manning, and Timothy Nelson—are "co-owners" and officers of the Symbiont entities. *Id.* ¶¶ 10–13, 31.

The facts that led the plaintiffs to file both this suit and Case No. 17-C-1407 are as follows. In late 2011, before TVJ became an affiliate of Symbiont, TVJ hired Rousse

---

[1] In general, all citations to a complaint are to the complaint in this action. However, I will occasionally cite the complaint in the first-filed case, and when I do so I will append the case number (17-C-1407) to the citation.

as an employee and entered into a formal employment agreement with him. At that time, Rousse had relationships with various "light commercial" construction customers, including The Kroger Company and Menard, Inc. By hiring Rousse, TVJ gained access to these customers and was able to expand its business in the light commercial construction market. The employment agreement provided that Rousse would receive a 30% commission on the gross profit of all new business that he brought to TVJ. The parties performed under this agreement for several years, and Rousse helped TVJ secure substantial business with customers such as Menards and Kroger.

In March 2015, TVJ was purchased by defendant Symbiont Holding Company, Inc. Under the terms of the purchase agreement, TVJ's assets and liabilities were assumed by Symbiont Holding, including TVJ's obligations and liabilities under the employment agreement with Rousse. Compl. ¶ 30. That same month, the parties decided to convert Rousse from an employee to an independent contractor. Rousse formed Roumann Consulting, and on March 25, 2015, TVJ and Roumann entered into an independent contractor agreement.

Under the independent contractor agreement, Rousse[2] was to pursue work for specific clients—Menards, Kroger, The Fresh Market, and L.A. Fitness—and assist with the management of construction projects for these clients. In exchange, TVJ agreed to pay Rousse an hourly rate and a commission of 30% of the net profits realized on each project. Like with the employment agreement, the parties performed under the independent contractor agreement for some time, and Rousse continued to obtain

---

[2] Although the agreement was technically between TVJ and Roumann Consulting, I will refer to Rousse as a party to the contract because he is the only agent of Roumann involved in this suit and only his acts are at issue.

substantial business for TVJ from Menards, Kroger, and other light-construction customers.

The plaintiffs allege that, by later in 2015, Symbiont's co-owners and managers (i.e., Bachman, Simon, Manning, and Nelson) started to believe that Rousse was overcompensated. In the spring of 2017, they "unsuccessfully attempted to persuade Mr. Rousse and Roumann Consulting to lower Roumann Consulting's commission rates." Compl. ¶ 49. Ms. Simon—Symbiont's general counsel—began to "undermine or harass" Rousse and told him that he was "unnecessary" and that Symbiont "could function properly without him." *Id.* ¶ 50. Further, as the spring progressed, Symbiont and TVJ communicated directly with Rousse's customers in an effort to cut him out of the business. *Id.* ¶ 51. On two occasions, TVJ's president (Nelson) and Rousse had disputes over certain clients and projects, and Nelson purported to terminate Rousse over these matters. *Id.* ¶ 52. However, Rousse continued to work for TVJ.

In August 2017, Bachman, Manning, Nelson, and Simon had a meeting in which they decided they wanted to terminate the independent contractor agreement with Rousse/Roumann. Compl. ¶ 54. That agreement provided that either party could terminate it "for any reason" on 30 days' written notice. Agreement § 4.1, ECF No. 1-1. However, the agreement drew a distinction between termination for "Willful Misconduct" and termination "for any reason other than 'Willful Misconduct.'" *Id.* § 4.2(b)–(d). Under the relevant provisions, if TVJ terminated the agreement for any reason other than willful misconduct, it was required to continue making commission payments to Rousse on projects related to his clients (*i.e.*, Kroger, Menards, etc.) that TVJ accepted either while the agreement was in force or during the two-year period following the

agreement's termination. *Id.* § 4.2(b). If, however, TVJ terminated the agreement for willful misconduct, then Rousse was not entitled to post-termination commission payments.

The independent contractor agreement did not contain a noncompete provision or other provisions that limited Rousse's ability to work for or consult with another construction firm following his termination, whether for willful misconduct or otherwise. Nor did it prevent Rousse from soliciting the customers, such as Menards and Kroger, that he had brought to TVJ or from hiring TVJ's employees. However, Symbiont's four officers and co-owners wanted to prevent Rousse from taking his former customers to a competing construction firm after he was terminated. They also wanted to prevent Rousse from hiring away TVJ's employees.

On August 21, 2017, TVJ sent a letter to Rousse notifying him that TVJ was terminating the agreement, effective September 20, 2017. *See* Compl. Ex. 2, ECF No. 1-2. The letter was printed on TVJ letterhead but was signed by both Timothy Nelson, as the president of TVJ, and Edward Manning, Jr., as the CEO of "Symbiont®". *Id.* The letter did not state that TVJ was terminating the agreement for willful misconduct. Moreover, the letter stated that TVJ intended to make commission payments to Rousse for projects accepted during the two-year period following the agreement's termination. The letter stated that this two-year period would end on September 20, 2019.

In the letter, TVJ told Rousse that, given his right to receive commissions on projects accepted by TVJ during the two-year period following his termination from Menards, Kroger, L.A. Fitness, and The Fresh Market, the parties had a "mutual interest" in having TVJ continue to book profitable business with these customers. *Id.*

TVJ stated that, therefore, it expected Rousse not to disparage TVJ or Symbiont, interfere with its contracts with these customers, or solicit TVJ's employees. TVJ told Rousse that if he disparaged TVJ, interfered with its customer contracts, or solicited its employees, TVJ would cease making commission payments and consider taking legal action.

At the same time that TVJ sent the termination letter to Rousse, it sent notices of the termination to Kroger, Menards, and Rousse's other clients. TVJ informed these clients that its parting with Roumann was "amicable" and that TVJ would continue working on the clients' projects. Compl. ¶ 71.

After Rousse received the termination notice, he initially acquiesced in TVJ's request that he not interfere with TVJ's relationship with Kroger, Menards, and the other clients. Compl. ¶ 77. Moreover, on September 22, 2017, TVJ made a post-termination payment to Rousse in the amount of $56,038.44. However, the plaintiffs allege that, after September 22, 2017, Symbiont's managers asked Rousse to accept a single lump-sum payment in lieu of ongoing commission payments so that the parties would not have to "continue the business 'marriage' for the next two years (or more)" as contemplated by the independent contractor agreement. *Id.* ¶ 78. Rousse declined this request. At that point, Symbiont's managers decided that, during his time at TVJ, Rousse had engaged in "willful misconduct" in certain respects and that therefore they could terminate the agreement without making additional commission payments. *Id.* ¶ 79.

In Rousse's view, TVJ failed to make a required post-termination payment at the end of September or early October of 2017. On October 13, 2017, he and Roumann

commenced the action for breach of contract against TVJ that is pending as Case No. 17-C-1407. On January 17, 2018, the plaintiffs filed an amended complaint in that action alleging that TVJ breached the employment contract and breached the independent contractor agreement by failing to make required payments. (The amended complaint includes a count for breach of the duty of good faith and fair dealing, but this count simply repeats the allegations of the breach-of-contract counts.) The amended complaint also alleges that, following Rousse's termination, TVJ mishandled certain projects for his former clients, including Kroger. *See* Compl. in 17-C-1407 ¶ 40.j. The amended complaint alleges that because of TVJ's incompetence, it earned fewer profits on these projects than it would have if Rousse had still been involved. The amended complaint alleges that because Rousse was entitled to 30% of all the profits that TVJ earned on the projects for his former clients, TVJ's incompetence caused an "erosion" of his commissions, making it liable for the difference. *See id.*

When TVJ answered the first amended complaint in Case No. 17-C-1407, it also filed a counterclaim seeking a declaration that the plaintiffs were entitled to no further payments under the independent contractor agreement. The counterclaim alleged two grounds for such a declaration. First, it alleged that Rousse had engaged in willful misconduct and that therefore the independent contractor agreement should be deemed to have been terminated for willful misconduct, which would entitle the plaintiffs to no post-termination payments. Second, the counterclaim alleged that Rousse had materially breached the independent contractor agreement by failing to return TVJ's property and confidential information at the time of his termination.[3]

---

[3] Contemporaneously with my opinion in this case, I am issuing an order granting the plaintiffs' motion for summary judgment on TVJ's counterclaims in Case No. 17-C-1407.

On March 20, 2018, the plaintiffs filed a motion for leave to file a second amended complaint in Case No. 17-C-1407. The proposed second amended complaint named Symbiont Science, Engineering, and Construction, Inc., as a party. However, that complaint did not allege distinct claims against this Symbiont entity. Instead, it alleged that Symbiont was TVJ's alter ego and that therefore the two companies should be treated as a single corporate entity. *See* Prop. Second Am. Compl. in 17-C-1407 ¶ 23. Thus, according to that complaint, Symbiont was liable to the plaintiff to the same extent TVJ was. The proposed second amended complaint also alleged a new cause of action against both TVJ and Symbiont—intentional interference with prospective business relations. This cause of action alleged that TVJ and Symbiont engaged in wrongful conduct that "disrupted" Rousse's "relationships" with the clients that he previously brought to TVJ, *i.e.,* Kroger, Menards, and the Fresh Market. *Id.* ¶ 84. The alleged wrongful conduct consisted of advising these customers that Rousse had been terminated and "disparag[ing]" Rousse and Roumann Consulting in unspecified ways. *Id.* ¶ 83.

In an order dated May 7, 2018, I denied the plaintiffs' motion for leave to file the second amended complaint. *See* ECF No. 30 in Case No. 17-C-1407. I noted that the motion was filed after the deadline for joining parties and amending pleadings, and that therefore the plaintiffs had to establish good cause for modifying the scheduling order before they could be granted leave to amend. I found that the plaintiffs had not shown good cause, and therefore I denied the motion for leave to amend.

On October 2, 2018, the plaintiffs filed their complaint in the present action, which is based largely on the same factual matter as the complaint in 17-C-1407, namely,

Rousse's termination, TVJ's failure to pay amounts due under the employment and independent contractor agreements, and TVJ's alleged incompetence in handling projects for Rousse's former clients following his termination.

The first three causes of action alleged in the complaint in this case are identical to the first three causes of action in Case No. 17-C-1407: Count I is for breach of the employment agreement,[4] Count II is for breach of the independent contractor agreement, and Count III is for breach of the duty of good faith and fair dealing. Moreover, the plaintiffs allege a separate cause of action (Count VIII) for breach of the duty of good faith and fair dealing that expands on the claim of commission erosion alleged in the amended complaint in Case No. 17-C-1407. In addition, two causes of action alleged in this case could be characterized as affirmative defenses to TVJ's counterclaims in the Case No. 17-C-1407. In one such cause of action (Count IX), the plaintiffs allege that the defendants are estopped from asserting willful misconduct as a basis for refusing to make payments under the independent contractor agreement. In another (Count X), the plaintiffs allege that the defendants have waived their right to assert willful misconduct as a basis for refusing to make such payments.[5]

The fifth cause of action in this case is the claim for intentional interference with prospective business relations that the plaintiffs had alleged in their proposed second amended complaint in Case No. 17-C-1407. That is, the plaintiffs allege that by

[4] Count I also includes an allegation that TVJ violated Wisconsin wage and hour law, but this is merely an alternative legal theory for the same underlying grievance, namely, TVJ's failure to pay amounts due under the employment agreement.

[5] Because TVJ's counterclaims seek only declaratory relief stating that it does not owe Rousse payments under the independent contractor agreement, the plaintiffs' claims for estoppel and waiver could also be characterized as alternative legal theories for obtaining the relief sought in Case No. 17-C-1407, namely, the amounts owed under the independent contractor agreement.

informing Rousse's customers that he had been terminated and by disparaging him in unspecified ways, the defendants "disrupted" Rousse's relationships with those customers. Compl. ¶¶ 139–40.

The complaint in this action also alleges four new causes of action that are based on the same facts as the amended complaint in Case No. 17-C-1407. First, in Count VI, the plaintiffs allege that the Symbiont entities and their owners and managers all conspired to injure Rousse in his business, in violation of Wisconsin Statute § 134.01. The basis for this conspiracy claim is the meeting that the managers held in August 2017 in which they decided to terminate the agreement, along with their later decision to refuse to make post-termination payments after Rousse refused to accept a lump-sum buyout. Second, in Count XIII, the plaintiffs allege that this same conduct amounted to a violation of Wisconsin antitrust law. Third, in Count XI, the plaintiffs allege that the defendants unjustly enriched themselves by retaining Rousse's commissions. Fourth, in Count XII, the plaintiffs allege that Symbiont and the two officers who signed the August 21, 2017 termination letter fraudulently induced him to refrain from interfering with TVJ's relationship with his former customers by promising to pay him post-termination commissions on projects that TVJ booked with those customers.

Finally, the complaint alleges two causes of action (Counts IV and VII) that are based on conduct not at issue in Case No. 17-C-1407. Here, the complaint alleges that, during his time at TVJ, Rousse shared various forms of confidential information— namely, "subcontractor and supplier lists, bidding detail, technical information, and costumer proposals"—with the company. Compl. ¶¶ 43, 124. Rousse alleges that the independent contractor agreement protected his confidential information and granted

TVJ the right to use such information only while the agreement was in force. He contends that, in violation of the agreement, Symbiont has been using his confidential information to prepare bids for new projects. The complaint seeks damages based on Symbiont's retaining and using this information and declaratory and injunctive relief against Symbiont's further using the information.[6]

The defendants now move to dismiss the complaint in this action for failure to state a claim upon which relief may be granted. First, they contend that this action is duplicative of Case No. 17-C-1407 and that therefore the complaint should be dismissed for claim splitting. Second, they contend that certain claims asserted in this action that may not be barred by the claim-splitting doctrine should be dismissed on the merits because they fail as a matter of law.

## II. DISCUSSION

### A.    Claim Splitting

The doctrine of claim splitting is related to, but distinct from, the doctrine of claim preclusion (also known as *res judicata*). *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000). Both doctrines serve the same interests of promoting judicial economy and shielding parties from vexatious concurrent or duplicative litigation. *Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011). But claim splitting is more concerned with the

---

[6] To some extent, the plaintiffs' allegations concerning misuse of confidential information are sprinkled throughout the other causes of action. For example, in the unjust-enrichment count, the plaintiffs allege that the defendants' use of the confidential information resulted in unjust enrichment. However, these additional allegations relate to alternative legal theories rather than distinct claims for relief. The plaintiffs have one basic grievance relating to the confidential information, namely, that the defendants wrongfully retained it and are using it to compete with Rousse. And the relief requested is the same for all legal theories: damages for use of the information and an order requiring the defendants to return the confidential information.

district court's comprehensive management of its docket, whereas claim preclusion focuses on protecting the finality of judgments. *Id.*

Claim preclusion "applies to bar a second suit in federal court when there exists: (1) an identity of the causes of actions; (2) an identity of the parties or their privies; and (3) a final judgment on the merits." *Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013) (internal quotation marks and citation omitted). Claim splitting, in contrast, applies when the first two elements of claim preclusion are present but final judgment has not yet been entered in the first suit. *See Katz*, 655 F.3d at 1218. In short, "the test for claim splitting is not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit." *Id.*

In deciding whether claim splitting applies here, I start by noting that the parties to this case and Case No. 17-C-1407 are not identical. The defendant in Case No. 17-C-1407 is T.V. John & Son, Inc., which I have been referring to as "TVJ." In contrast, the defendants in the present case are (1) Symbiont Construction, Inc.; (2) Symbiont Holding Company, Inc.; (3) Symbiont Science, Engineering and Construction, Inc.; and (4) the "co-owners" (*see* Compl. ¶ 31) and officers of these entities: Thomas Bachman, Sonya Simon, Edward Manning, and Timothy Nelson. However, as explained below, all defendants in this case are in privity with TVJ.

First, the complaint alleges that Symbiont Construction, Inc., "is now T.V. John." Compl. ¶ 8. Thus, "Symbiont Construction, Inc." and "T.V. John, Inc." are simply two different names for the same legal entity and therefore are the same party for preclusion and claim-splitting purposes. Second, the remaining Symbiont entities—Symbiont Holding, Inc., and Symbiont Science, Engineering, and Construction, Inc.—are parties

to this case only because they are alleged to form part of "a single company branded and called 'Symbiont.'" Compl. ¶ 9. That is, the plaintiffs do not allege that Symbiont Holding or Symbiont Science are liable because they committed acts separately from TVJ/Symbiont Construction that harmed them. Instead, they allege that Symbiont Holding and Symbiont Science are liable because the relevant "corporate veils" should be pierced. *See* Compl. ¶ 88 (alleging that TVJ, which is actually Symbiont Construction, and the remaining Symbiont entities have "failed to maintain separate corporate identities" and that therefore their "separate corporate identit[ies] should be disregarded"). But if this allegation were true, then all three Symbiont entities would be privies for preclusion and claim-splitting purposes. *Torain v. AT&T Mgmt. Servs., LP*, 353 F. App'x 37 (7th Cir. 2009); *see also Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F. 2d 1320, 1327 (7th Cir. 1992) (recognizing that a prior suit against a "cat's paw" will bar a later suit against the cat because the cat and its paw are privies); *Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1275 (10th Cir. 1995) (allegation of alter ego liability establishes privity between two corporations for purposes of claim preclusion). Finally, the owners and officers of a corporation are generally deemed to be in privity with the corporation. *See Horwitz v. Alloy Auto. Co.*, 992 F.2d 100, 103 (7th Cir. 1993) (CEO and owner of corporation in privity with corporation); *Rutledge v. Eli Lilly & Co.*, 545 F. App'x 523, 524–25 (7th Cir. 2013) (officer of corporation in privity with the corporation). Accordingly, all parties to this suit are either the same as, or in privity with, the party to Case No. 17-C-1407.

Next, I address whether the causes of action are identical in this suit and Case No. 17-C-1407. Federal law defines a "cause of action" as "a core of operative facts

which give rise to a remedy." *Bernstein*, 733 F.3d at 226 (quoting *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1365 (7th Cir.1988)). Accordingly, the test for an "identity of the causes of action" is "whether the claims arise out of the same set of operative facts or the same transaction." *Id.* (quoting *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*, 649 F.3d 539, 547 (7th Cir.2011)). "Even if the two claims are based on different legal theories, the two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Id.* (internal quotation marks omitted).

In the present case, nearly all claims are based on the same or nearly the same factual allegations as the claims in Case No. 17-C-1407. Those factual allegations consist of the circumstances surrounding Rousse's termination, TVJ's failure to pay amounts due under the employment and independent contractor agreements, and TVJ's alleged incompetence in handling projects for Rousse's former clients following his termination. Moreover, some of the counts alleged in this action are precisely the same as counts alleged in Case No. 17-C-1407, including Count I for breach of the employment agreement, Count II for breach of the independent contractor agreement, and Count III for breach of the duty of good faith and fair dealing. Count VIII asserts a separate claim for breach of the duty of good faith and fair dealing relating to "profit erosion" but this is simply an expanded version of the claim for profit erosion that appears in the amended complaint in Case No. 17-C-1407. *Compare* Compl. ¶¶ 162–72 *with* Am. Compl. in 17-C-1407 ¶ 51.j.[7] Other causes of action—Counts IX and X—are

---

[7] To the extent that the claim for profit erosion identifies new projects that TVJ supposedly botched since the date of the first amended complaint in Case No. 17-C-1407, the plaintiffs are free to pursue damages related to those projects in Case No. 17-C-1407.

not true causes of action but instead allege reasons why TVJ's counterclaims in Case No. 17-C-1407 should fail, namely, estoppel and waiver. Alternatively, Counts IX and X are merely alternative legal theories for obtaining the same relief sought in Case No. 17-C-1407, namely, the amounts owed under the independent contractor agreement.

Many of other counts are also nothing more than different legal theories for seeking relief for the same basic grievances alleged in Case No. 17-C-1407. Count XI in this action alleges unjust enrichment, but this is merely an alternative legal theory for recovering the same damages for breach of contract at issue in Case No. 17-C-1407. Count V alleges interference with prospective business relations. This is the same count that the plaintiffs attempted to assert in their proposed second amended complaint in Case No. 17-C-1407. Moreover, it arises out of the same facts alleged in that case, namely, TVJ/Symbiont's conduct at the time of the termination and shortly thereafter. *See* Compl. ¶¶ 137–40. The same is true for the plaintiffs' claims of conspiracy to injure business (Count VI), fraudulent inducement (Count XII), and antitrust violations (Count XIII)—these claims arise out of TVJ/Symbiont's actions in terminating the independent contractor agreement and later refusing to pay commissions.

However, the complaint in this action asserts one claim that is not based on the same operative facts or transaction as Case No. 17-C-1407. The plaintiffs allege that the defendants are committing an ongoing, distinct breach of the independent contractor agreement by using Rousse's confidential information to bid on new projects. The allegations forming the basis for this grievance appear in Counts IV and VII, but they also appear briefly in other counts and in the main factual allegations of the complaint. Although the facts relating to the use of such confidential information are generally

related to the facts underlying the plaintiffs' claim for nonpayment of commissions, I do not think these claims involve the same or nearly the same factual circumstances. Essentially, the respective claims each arise out of a different breach of the independent contractor agreement—the claim in this case involves breach of the confidentiality provisions, while Case No. 17-C-1407 involves breach of the commission and termination provisions. Moreover, each breach is based on different conduct. The confidentiality claim in this case involves the defendants' conduct in using Rousse's confidential information when bidding for jobs, while Case No. 17-C-1407 involves the defendants' conduct in terminating Rousse, failing to pay post-termination commissions, and mishandling projects for his former clients. Finally, at least some of the conduct involved in the confidentiality claim is alleged to have occurred after the date of the first amended complaint in Case No. 17-C-1407. Such conduct thus could not be within the scope of the facts alleged in that complaint. *See Curtis*, 226 F.3d at 139 ("While claim preclusion bars relitigation of the events underlying a previous judgment, it does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit.").

Accordingly, I conclude that the plaintiffs' claim that the defendants have misused his confidential information is not barred by the claim-splitting doctrine. However, all other claims that the plaintiffs have alleged in this case will be dismissed for claim splitting.

**B.    Alternative Dismissal of Certain Claims on the Merits**

The defendants contend that, to the extent the plaintiffs' claims in this action are new, they must be dismissed on the merits. Specifically, the defendants focus on the

plaintiffs' claims for intentional interference with prospective business relations, conspiracy to injure business, unjust enrichment, and antitrust violations. Because I have already dismissed these claims for claim splitting, I do not need to address the defendants' alternative arguments for dismissal. However, because it is so clear that these claims fail as a matter of law, I will explain why that is so.

In addressing these claims on the merits, I look to see whether the complaint "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing a plaintiff's complaint, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal*, 556 U.S. at 678.

### 1. Intentional Inference with Prospective Contract

To prevail on a tortious interference claim under Wisconsin law, a plaintiff must satisfy five elements: (1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 682 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

In their claim for tortious interference, the plaintiffs allege that TVJ/Symbiont is liable for "disrupting" Rousse/Roumann's "positive working relationships" with Menards, Kroger, and other light-construction customers because it "intentionally and wrongly advised the customer and client contacts that Mr. Rousse and Roumann consulting had been terminated." Compl. ¶¶ 137–40. The plaintiffs also allege that TVJ/Symbiont "disparaged" Rousse/Roumann, but they do not identify the allegedly disparaging statements. *Id.* ¶ 139.

The first problem with this claim is that it does not allege that TVJ/Symbiont interfered with a contract or a prospective contract. Rouse and Roumann are not construction firms and do not enter into contracts with light-construction customers such as Menards and Kroger. Instead, they are consultants who work for construction firms that, in turn, enter into contracts with light-construction customers. *See* Compl. ¶ 59 (alleging that, to continue servicing customers such as Menards and Kroger, the plaintiffs must associate with a different construction firm). The only contracts or prospective contracts identified in the complaint are the contracts that TVJ entered into with these customers. *See* Compl. ¶ 134. Although the plaintiffs contract directly with construction firms such as TVJ/Symbiont and its competitors, they do not allege that TVJ/Symbiont interfered with any contract or prospective contract that they might have had or sought with a competing construction firm.

Because the plaintiffs do not allege that they could have entered into contracts with customers such as Menards and Kroger, their tortious interference claim could succeed only if Wisconsin recognized a claim for intentional interference with an existing or prospective *noncontractual* business relationship, such as the relationship

between a sales representative and the customers he or she solicits on behalf of another firm. However, the plaintiffs do not cite, and I have not found, a case decided by a Wisconsin state court recognizing such a claim. Moreover, the Seventh Circuit has canvassed the Wisconsin cases on tortious interference and concluded that Wisconsin does not recognize a claim for tortious interference with a "mere 'business relationship.'" *Shank*, 192 F.3d at 684–91. Instead, the court held, Wisconsin only protects existing contractual relationships or "sufficiently concrete prospective contract[s]." *Id.* at 689.[8] Finally, the idea that Wisconsin does not recognize a cause of action for tortious interference with a mere business relationship is reflected in its pattern jury instruction on tortious interference, which lists the first element of the claim as proof of the existence of a contract or prospective contractual relationship. Wis. Jury Instructions-Civil § 2780 (2014). The instruction even prompts the court to give a separate instruction on the elements of contract formation "[i]f there is an issue on whether the relationship amounts to a contract." *Id.*

Even if Wisconsin recognized a tort for intentional interference with a noncontractual relationship, the plaintiffs' claim would fail. The complaint does not identify any concrete way in which TVJ/Symbiont's alleged conduct harmed Rousse/Roumann's relationships with the customers. The complaint does not, for

---

[8] The plaintiff cites a case from within this district in which a district judge seemingly recognized a salesman's claim for tortious interference with a prospective business relationship under Wisconsin law. *See Simpson v. Ha-Lo Indus., Inc.*, 74 F. Supp. 2d 861, 862 (E.D. Wis. 1999). However, district-court decisions have no precedential value apart from the quality of their reasoning, and the *Simpson* case contains almost no reasoning on the question of whether Wisconsin recognizes a claim for tortious interference with a noncontractual business relationship. In any event, I am bound by Seventh Circuit cases, and as discussed in the text, the Seventh Circuit has held that Wisconsin does not recognize a claim for tortious interference with a noncontractual business relationship.

example, allege that Rousse was unable to procure any specific contract from the customers for a competing construction firm because of TVJ/Symbiont's actions. Instead, the complaint simply alleges in conclusory fashion that TVJ/Symbiont's actions "disrupted" Rouse and Roumann's "positive working relationships" with the customers. Compl. ¶¶ 137–40. This vague and conclusory allegation is insufficient to state a plausible claim for tortious interference. *See Iqbal*, 556 U.S. at 678.

Finally, the complaint does not plausibly allege that TVJ/Symbiont engaged in conduct that rose to the level of actionable interference. The complaint alleges only one specific form of conduct in the tortious-interference count, namely, advising Rousse's client contacts "that Mr. Rousse and Roumann Consulting had been terminated." Compl. ¶ 139. But it was true that Rousse and Roumann had been terminated, and the transmission of truthful information is not tortious interference. *See Liebe v. City Finance Co.*, 98 Wis. 2d 10, 13 (Ct. App. 1980) ("the transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract") The complaint also alleges that TVJ/Symbiont "disparaged" Rousse and Roumann, ¶ 139, but it does not allege what this supposed "disparagement" consisted of. Thus, this is a conclusory allegation that I may ignore. *See Iqbal*, 556 U.S. at 678.

For these reasons, I conclude that the plaintiffs' claim for tortious interference fails to state a claim on which relief may be granted.

## 2. Conspiracy to Injure Business

Wisconsin Statute § 134.01 prohibits conspiracies between two or more people to willfully or maliciously injure the reputation, trade, business, or profession of another.

Although the statute uses the disjunctive phrase "willfully or maliciously," the Wisconsin Supreme Court, following the lead of the United States Supreme Court, has held that the phrase must be read conjunctively. *See Maleki v. Fine-Lando Clinic Chartered, S.C.*, 162 Wis.2d 73, 86 & 91 n.10 (1991) (citing *Aikens v. Wisconsin*, 195 U.S. 194 (1904)). This means that, to succeed on a claim under § 134.01, a plaintiff must establish that the defendants acted maliciously. "For conduct to be malicious under conspiracy law it must be conduct intended to cause harm for harm's sake." *Id.* at 86. According to the Seventh Circuit, for conduct to be malicious, the defendants' motive cannot make sense; instead, "[t]he plaintiff must allege and then prove an irrational desire to harm for harm's sake." *Virnich v. Vorwald*, 664 F.3d 206, 214 (7th Cir. 2011).

In the present case, the plaintiffs allege that all defendants—the Symbiont entities and their managers—conspired to harm them in their business by causing TVJ to terminate the independent contractor agreement and later fail to make post-termination commission payments. Compl. ¶ 144. There are two defects in this claim. The first is that a business decision made by the managers of a company is not legally considered to be the product of a "conspiracy." *See Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.3d 108, 110 (7th Cir. 1990) (recognizing that "managers of a corporation jointly pursuing its lawful business" are not "conspirators"). The second is that the plaintiffs have pleaded themselves out of court by alleging that the defendants acted with rational business motives. Here, I will focus on the second defect.

The plaintiffs allege that the four individual defendants—the co-owners and officers of the Symbiont entities—had a meeting at which they decided that Rousse was overcompensated and that the firm could continue its business with customers such as

Menards and Kroger without him. Compl. ¶¶ 45, 48, 50, 54. For these reasons, they decided to cause TVJ to terminate the independent contractor agreement and pay Rousse his post-termination commissions. *Id.* ¶¶ 54, 68–74. The complaint alleges that, about one month later, the managers decided that they did not want to continue their business "marriage" with Rousse for the full two-years-plus post-termination commission period, and that therefore they offered him a single lump-sum payment in lieu of periodic commission payments. *Id.* ¶ 78. When Rousse rejected this offer, the managers decided to take the position that Rousse had committed willful misconduct and therefore was not entitled to post-termination commission payments at all. *Id.* ¶ 79.

These facts establish that the defendants did not act maliciously, that is, with an irrational desire to cause harm for harm's sake. It is true that the complaint alleges generally that the defendants acted "maliciously," *see* Compl. ¶ 144, and that, under federal pleading rules, malice may be alleged generally, *see* Fed. R. Civ. P. 9(b). But the plaintiffs then undermine their own allegation of malice by pleading that the defendants acted rationally in furtherance of TVJ/Symbiont's business interests by attempting to terminate a contractor that the firm deemed overcompensated and expendable while paying him as little post-termination compensation as possible and keeping the customers he had brought to the firm. *See Sabrina Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 590 (7th Cir. 2017) (recognizing that "[a] plaintiff can plead herself out of court by alleging facts that show she has no legal claim.") Accordingly, the complaint fails to state a claim for relief under Wis. Stat. § 134.01.

### 3. Unjust Enrichment

In Count XI, the plaintiffs allege that the three Symbiont defendants would be unjustly enriched if they were allowed to "retain commissions and other payments owed to Roumann Consulting." Compl. ¶ 201. The defendants contend that this allegation fails to state a claim because Roumann's right to commission payments is governed by a contract—the independent contractor agreement.

Under Wisconsin law a claim for unjust enrichment does not exist when the subject of the claim is addressed by a valid and enforceable contract. *See, e.g., Cont'l Cas. Co. v. Wis. Patients Compensation Fund*, 164 Wis. 2d 110, 118 (Ct. App. 1991). The plaintiffs do not dispute this point. Nor do they contend that the independent contractor agreement might be deemed invalid or unenforceable. Instead, they contend that because none of the Symbiont entities is a named party to the agreement, they are free to assert claims for unjust enrichment against them. *See* Pls.' Br. at 25, ECF No. 10. But this flies in the face of the plaintiffs' whole theory as to why the Symbiont defendants could be liable to them, which is that Symbiont Construction *is* TVJ and that the other two Symbiont entities are simply alter egos of each other and of Symbiont Construction/TVJ. *See* Compl. ¶¶ 8, 9 & 88. The plaintiffs' claims do not arise out of any conduct by a Symbiont entity that was not taken in its capacity as TVJ's successor and/or alter ego. Thus, the Symbiont entities could be liable for nonpayment of commissions only if TVJ were liable, and whether TVJ is liable is governed by the independent contractor agreement. Accordingly, the plaintiffs cannot maintain a claim for unjust enrichment based on the failure to pay commissions.[9]

---

[9] As noted above, however, the plaintiffs separately allege that the defendants have misused Rousse's confidential information and assert unjust enrichment as one of their

### 4. Wisconsin Antitrust Law

In Count XIII, the plaintiffs allege that the defendants violated Wisconsin's version of § 1 of the Sherman Act, Wis. Stat. § 133.03(1), which Wisconsin courts construe in conformity with federal cases decided under the Sherman Act. *See, e.g., Conley Publ'g Grp., Ltd. v. Journal Commc'ns, Inc.*, 265 Wis. 2d 128, 140–41 (2003), *abrogated on other grounds by Olstad v. Microsoft Corp.*, 284 Wis. 2d 224 (2005).

The plaintiffs allege that the defendants sought to horizontally restrain trade by notifying customers such as Menards and Kroger that TVJ had terminated Rousse and Roumann "in such a manner that it would frustrate Mr. Rousse's and Roumann Consulting's ability to compete." Compl. ¶¶ 214–15. This is the sum total of the plaintiffs' allegations concerning a supposed antitrust violation, and it is difficult to find anything in them suggesting that the defendants engaged in anticompetitive behavior. The plaintiffs' brief does not expand on the complaint's allegations or provide a cogent explanation as to how the defendants could be deemed to have violated antitrust law. *See* Pls.' Br. at 26, ECF No. 10. Instead, the brief simply asserts that the defendants entered into a "horizontal agreement" and then observes that horizontal restraints are unreasonable per se. *Id.* But although the complaint accuses the defendants of seeking to "horizontally restrain competition," ¶ 214, it does not identify any potential horizontal restraint.

A horizontal restraint is one among competitors at the same level of distribution. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988); *Miles Distribs., Inc. v. Specialty Const. Brands, Inc.*, 476 F.3d 442, 448 (7th Cir. 2007); *Horizontal*

---

legal theories in support of this claim. At this time, the unjust-enrichment count, as it relates to the confidential information, may proceed.

*Restraint*, <u>Black's Law Dictionary</u> (7th ed. 1999). Because Symbiont is a construction firm, it could horizontally restrain trade only by entering into a contract, combination, or conspiracy with another construction firm. But the complaint does not identify another construction firm or suggest that Symbiont conspired with one.[10] The only other entities identified in the complaint are Rousse/Roumann and companies such as Menards and Kroger. But these entities are not at the same level of distribution as Symbiont. Rousse and Roumann are not construction firms; they are consultants that provide services to construction firms. And obviously companies such as Menards and Kroger are not construction firms; they are customers of such firms. Thus, no horizontal conspiracy is alleged.

Finally, it is difficult to understand how the only concrete action alleged in the antitrust count—Symbiont's notifying its customers that it had terminated Rousse/Roumann—could be deemed to have been anticompetitive. No doubt Symbiont told its customers about the termination to try and prevent them from following Rousse to whatever new construction firm he might join forces with. But of course, such conduct is not anticompetitive—it is competition for the customers' business. Even if such competition could be deemed unfair (and I do not think that it could), it would not give rise to antitrust liability. *See Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir.

---

[10] Symbiont might also be liable on a horizontal-restraint theory if it participated in a conspiracy between competitors on the same level of distribution as each other but on a different level than Symbiont. *See Miles Distribs., Inc.*, 476 F.3d at 449 & n.7 (noting the possibility that "a facially vertical restraint imposed by a manufacturer can be horizontal if caused by a 'horizontal cartel' among distributors"). However, the complaint in this action does not identify a conspiracy among competitors at a different level than Symbiont.

1992) (noting that unfair competition is not redressable under the antitrust laws). Accordingly, the complaint fails to state a claim for relief under Wisconsin antitrust law.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion to dismiss (ECF No. 4) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to all claims except for claims based on Symbiont's alleged misuse of the plaintiffs' confidential information.

Dated at Milwaukee, Wisconsin, this 1st day of August, 2019.

s/Lynn Adelman
LYNN ADELMAN
District Judge