UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

ROUMANN CONSULTING INC. and
RONALD ROUSSE,

                    Plaintiffs,

         v.                                              Case No. 2:18-cv-01551-LA

SYMBIONT CONSTRUCTION, INC.,
SYMBIONT HOLDING COMPANY, INC.,
SYMBIONT SCIENCE, ENGINEERING AND
CONSTRUCTION, INC.,
THOMAS C. BACHMAN,
SONYA K. SIMON, ESQ.,
EDWARD T. MANNING, JR., and
TIMOTHY P. NELSON,

                    Defendants.

**SYMBIONT DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

        Three and one-half years after filing this lawsuit, and nearly five years since bringing its

first claims against Symbiont, Roumann Consulting has offered close to zero admissible

evidence supporting its remaining claims.  It is striking that in a case about the alleged

conversion of confidential information, Roumann, bearing the burden of proof, has not specified

with any degree of specificity *what* his confidential information is, how and when it was

misused, and how that misuse caused damage.  Far from advancing a basis for the entry of any

relief in its favor, Roumann Consulting's opening brief and its novel claim that every document

produced in this case constitutes Roumann's protected confidential information undermines the

claims.  Worse, Roumann's submission does not even attempt to explain how, or why, the

information meets the Independent Contractor Agreement's definition of "Confidential

Information" and instead relies exclusively upon Ronald Rousse's proclamation that everything is "his" Confidential Information. The motion must be denied.

## FACTUAL BACKGROUND

The factual background of this dispute is well-known to the Court, set forth in Symbiont's memorandum in support of its motion for summary judgment, and outlined in the Court's prior decisions and orders. Accordingly, the following summary of additional facts is limited to filling in the omissions and correcting misstatements contained in plaintiff Roumann Consulting's factual summary. (Dkt. 80, 3-17.)

I.   **Ronald Rousse was employed by Symbiont Construction to develop and bid new business – the same work he now contends he did on his own behalf, and for his exclusive benefit.**

Before creating plaintiff Roumann Consulting, Inc. and entering into the Independent Contractor Agreement, Ronald Rousse was T.V. John's employee. (Defendants' Statement of Proposed Additional Facts ("DSAF") 121.) A written employment agreement outlined the terms of his employment. (DSAF 122.) Mr. Rousse was the "Vice President of Estimating, Project Controls and Major Projects," T.V. John paid him a salary, benefits, and he also earned a "30% commission on the gross profit earned on new business (including Menards)" that he sought out and brought to the Company. (DSAF 123.) Mr. Rousse's job duties included estimating, bidding, and seeking out new construction project opportunities, in addition to the duty that he be "willing to bid on any associated work with TVJ's existing clients or public work that may be of interest" but he would not receive a 30% share of the profits from those existing clients unless separately agreed in writing. (DSAF 124.)  The written employment agreement did not contain any confidentiality protections or provisions, nor did it carve out any right for Ronald Rousse to retain for his personal use information used or created to carry out his obligations as an

employee. (DSAF 125.)  Finally, Mr. Rousse was explicitly an employee-at-will, and the agreement specifically contemplated that should Mr. Rousse and T.V. John part ways, T.V. John was, at its election, free to continue any operation or project without Rousse's services, including "all cliental that Ron Rousse engaged" and that T.V. John would pay Rousse 30% net profits realized for any such projects for the two-year period after his employment ended. (DSAF 126.)

These undisputed facts contradict Roumann's new assertion that Mr. Rousse collected information about subcontractors and vendors "while consulting for T.V. John from 2012 to 2015." (Memorandum in Support, Dkt. 80 at 5.)  Of course, the consulting began after Roumann Consulting, Inc. was eventually created and after it entered into the Independent Contractor Agreement in March 2015. (DSAF 127, 128.)  But in the 2011-2014 time-period Rousse was not consulting for T.V. John (now Symbiont Construction), but rather was an employee paid to collect and bid on new work for Symbiont Construction's benefit, not his own. (DSAF 129.)

## II. Roumann's first lawsuit seeking payment of commissions and invoices remains pending, and Symbiont Construction deposited funds exceeding the commissions owed into Court.

This case is preceded by the prior lawsuit Mr. Rousse and Roumann Consulting filed in which they seek payment of 30% net profit realized from certain construction projects, along with payment of other invoices Symbiont disputes. (DSAF 130.) In that case, the Court granted dispositive motions in favor of each party, resulting in an order that Roumann is entitled to commission payments "based on the amounts actually received from a client on a project," but it has not yet determined the specific amount of damages that Roumann may recover. (DSAF 131.)

Roumann's characterization of the procedural posture of that case omits that Symbiont deposited $550,000 with the court pursuant to Federal Rule of Civil Procedure 67 in June 2018. (DSAF 132.)  That amount, plus interest, remains deposited pending further order of the Court in

that case. (DSAF 133). Roumann sought an Order disbursing a portion of the funds, which the Court denied because the specific amount owed had not been proven. (DSAF 134.) Thus, Symbiont is not wrongfully withholding payments as Roumann contends in its motion, but rather Symbiont is litigating those claims after depositing more than the amount at issue into the Court Registry System.

## III. Roumann did not object to, and in fact encouraged Symbiont Construction to bid work during the two-year post-termination period.

There are other aspects of the first lawsuit that warrant brief discussion. Specifically, the complete absence of any claim, complaint, or demand with respect to what Roumann Consulting now contends to be its "Confidential Information." This absence of any contention concerning confidential information in the first lawsuit would be unremarkable, but for Roumann's new position that Symbiont was prohibited from bidding upon or seeking work from Menards, the Fresh Market, LA Fitness, or Kroger – the applicable clients for which Roumann was entitled to 30% net profit realized for projects for these clients that Symbiont Construction contracted in the two-year period following termination of the Independent Contractor Agreement.

The run-up to these lawsuits is well-trodden ground. Symbiont sent an August 21, 2017 letter to Roumann providing notice of termination of the Independent Contractor Agreement. (DSAF 135.) That letter explained that Symbiont would pay Roumann commission for the duration of projects accepted through September 20, 2019 for the enumerated clients, and stated that "it is in our mutual interest for [Symbiont] to continue to book profitable projects with the clients identified above." (DSAF 136.) Roumann now claims that this letter was the first time Symbiont ever raised the concept of soliciting new work post-termination. (Opening Brief, 23-24.) Roumann further now claims that Symbiont booking additional work, to which Roumann

was entitled to 30% of net profit realized, was somehow objectionable, and that Symbiont was not to use so-called "Confidential Information" to bid those projects. (*Id.* 21-23.)

Roumann never communicated these positions, likely because they were not actually Roumann's positions at the time of termination. Roumann's Canadian counsel responded to the notice of termination the next day and conveyed no objection to this "new concept" of Symbiont bidding and obtaining work during the two-year period following termination. (DSAF 137.) Rather, counsel was focused on ensuring that Roumann recovered its 30% net profit realized, and on maximizing those profits. Roumann's counsel specifically mentions and anticipates "future profits associated with current *and future projects* . . ." (emphasis added). (DSAF 138.) Of course, if the concept of Symbiont pursuing post-termination projects were "new" there would be some discussion of this novel concept being introduced. There was none. (DSAF 139.)

More central to the claims at issue here, there is no mention in counsel's letter concerning "Confidential Information." (DSAF 140.) The term is not mentioned, and counsel does not provide any demand, notice, or instruction concerning the use of Confidential Information, vis-à-vis the "current and future projects" which would yield Roumann commissions, or otherwise. (DSAF 140.)

This is not surprising because Roumann and its counsel (domestic and Canadian) were fully aware that Symbiont was bidding on projects in the two-year period following the Fall 2017 termination. When counsel for Roumann contacted Symbiont prior to filing its first lawsuit and made a litany of demands for information, that litany contained no reference or concern as to Confidential Information. (DSAF 141.) Similarly, the complaint in the first case did not raise a concern (or claim) concerning Confidential Information; neither did the first amended complaint

(filed January 17, 2018) or the second amended complaint Roumann and Rousse sought leave to file (March 20, 2018) after Roumann had conducted discovery. (DSAF 142.)

Even after this lawsuit was pending, Mr. Rousse testified that he was aware at the time of termination that Symbiont Construction was using what he deemed to be "Confidential Information" to bid on projects for Kroger, the Fresh Market and Menards:

> "It was noted in the [August 21, 2017] termination letter that they – Symbiont and T.V. John are going to engage in pursuing profitable work. They never returned my confidential information which they're going to engage. Immediately they engaged and called my 40 to 50 client contacts and reached out and attained future opportunities and bid 40 to 50 projects. That was the agreement, and they pursued that."

(DSAF 143, 144.) When asked if that was Mr. Rousse's understanding as to what Symbiont was "supposed to do" under Section 4.2(b) of the Agreement, Rousse answered: "Absolutely, and they fulfilled it." (DSAF 145.) Further, as detailed in the next section, counsel for Roumann Consulting maintained this same position—that Symbiont Construction was entitled to use any Confidential Information—as the two-year post-termination period expired.

## IV. Symbiont Construction offered to return Confidential Information to Roumann, and Roumann acknowledged Symbiont was entitled to use it during the two-year post termination period.

Symbiont summarized its unsuccessful efforts to avoid prolonging this case through the exchange of correspondence in the fall of 2019 in its opening memorandum. (Dkt 88, 7-9.) However, given Roumann's position as stated in its motion, a comparison of that position with its prior positions is warranted.

On August 12, 2019, counsel for the parties discussed Roumann's demand that Symbiont return Roumann's Confidential Information on August 31, 2019. (DSAF 146.) Symbiont responded to the demand by letter dated August 22, 2019, explaining that the Independent

Contractor Agreement did not contain a requirement that Symbiont return anything (though it did

require Roumann to return Symbiont's property). (DSAF 147.) Nonetheless, Symbiont offered to

return the Confidential Information, provided Roumann could identify it:

> Notwithstanding the lack of a contractual duty to return any materials to Roumann, in the interest of cooperation and avoiding unnecessary deliberations, Symbiont is writing to explore returning Confidential Information (to the extent it exists). In order to do so, we request and require that Roumann identify and itemize the Confidential Information it contends Symbiont possesses with detail sufficient to enable Symbiont to locate each component of the Confidential Information it allegedly possesses. Upon receipt of that itemization we can discuss the logistics for return of the information. Symbiont reserves all of its rights under the Agreement.

(DSAF 147, 148.)

As we know, Roumann was and is unwilling to itemize the alleged Confidential

Information in any meaningful or workable way and conveyed as much in response. (DSAF

149.) However, Roumann also confirmed its interpretation and authorization for Symbiont

Construction to use Confidential Information in bidding work during the two-year post

termination period. (DSAF 150.) The response letter quibbled about the proper termination

effective date (August 21, 2019 versus September 21, 2019), but acknowledged Symbiont

Construction's right to use the information for obtaining and soliciting projects, and even

referenced Roumann's claims that "Symbiont failed to pursue projects in good faith." (DSAF

150.)

Counsel exchanged letters outlining their differing interpretations of the Independent

Contractor Agreement, and the Confidential Information definitions and obligations. While

Roumann's counsel characterized Symbiont's position as "inane" and "nonsense," it clarified its

position as to whether Symbiont was entitled to use Confidential Information for bidding

between 2017-2019, stating: "We have never contended that the obligations of the Independent

Contractor Agreement extend in perpetuity. (DSAF 151.) Rather, the ability of T.V. John or its

successor to _use_ the information provided to it by Roumann expired on September 21, 2019 at the latest." (DSAF 151.) (emphasis in original).  Counsel continued:

> Paragraph 8.1 of the Independent Contractor Agreement permits the receiving party (here, T.V. John) to use any Confidential Information "solely for the purpose of permitting the Receiving Party to utilize it in connection of the performance of its obligations hereunder." Paragraph 8.1(a) additionally clarifies that Confidential Information can only be used "to the extent necessary to perform its obligations hereunder."
>
> The "hereunder" in both sections is a reference to the Independent Contractor Agreement. T.V. John had the right to submit bids for a two year period "following the effective date of the termination of the Agreement." Paragraph 8.1(b) includes specific additional clarification that use is limited to a two year period. Roumann believes that date was August 21, 2019, but T.V. John has contended that this date was September 20 or 21, 2019. Both dates have passed.

(DSAF 152.)

With these clarifications, the factual and procedural posture preceding dispositive motions is undisputed: Symbiont offered to return purported Confidential Information to the extent Roumann could provide specificity as to what it wanted returned, Roumann refused, and Roumann steadfastly insisted that Symbiont not only had the right to use what Roumann deems Confidential Information to bid on projects during the two-year post termination period, but the obligation to do so.[1]

## ARGUMENT

Roumann has three claims remaining in this case: a request for judicial declaration that Symbiont misappropriated Confidential Information, conversion, and unjust enrichment. Roumann now moves for partial summary judgment on its claim for a "declaration of misuse of confidential information / request for an injunction" and the liability component of its conversion

---

[1] Symbiont acknowledges that Roumann later pivoted, adopting the present argument that Symbiont was not obligated, or even allowed, to bid work in the two-year post termination period. What is clear is that the pivot occurred after the two-year period expired (and thus Symbiont had finished the bidding) and after waiving any claim to advance a contrary argument. (DSAF 151, 152.)

claim. (Dkt. 79, 1; Dkt. 80, 30 n.7.) Roumann's failure to provide any meaningful or specific itemization of what constitutes Roumann's "Confidential Information" renders any judicial declaration of misuse impossible and falls short of meeting Roumann's burden of proof. Further, the undisputed existence of a contract governing the issue of Confidential Information, and the fact that intangible information cannot be converted under Wisconsin law, precludes Roumann's conversion claim. Roumann's motion for partial summary judgment must be denied, and for the reasons set forth in Symbiont's pending motion, judgment should be entered dismissing all remaining claims.

## I. Roumann's inability or refusal to identify what constitutes its confidential information with any specificity makes a declaration of any sort impossible.

Roumann bears the burden of proof on each of its claims, and thus at the summary judgment stage must make a showing sufficient to establish each element of its claims. *E.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (discussing F.R.C.P. 56). Here, establishing, defining, and identifying what "Confidential Information" it contends was misused is an elemental and critical component to Roumann's claims. As to its declaratory judgment claim, Roumann asks this Court to declare that "Symbiont's use of Roumann Consulting's Confidential Information is a breach of Article VIII, Paragraph 8.1(a) of the Independent Contractor Agreement, and order that Symbiont refrain from future use of its Confidential Information." (Compl. [Dkt. 1] ¶ 132.) This request puts both the Court and Symbiont in a difficult position: what would such a declaration, if granted, mean? What would the Court mean by "Confidential Information" if no workable definition or itemization is given? Presumably, Roumann is leaving it to the Court to fashion such a definition, which alone renders the requested declaration improper.

To be sure, the latest manifestation of a definition and identification of confidential information that Roumann puts forth in its motion is detailed in the sense that it is seemingly concrete, but it is facially and breathtakingly broad. Roumann now contends that: "[o]f the 75,646[2] documents that [Symbiont] produced, all but one document – the Wisconsin Renewable Energy subcontractor list – were Roumann Consulting's Confidential Information." (Supporting Memorandum (Dkt. 80), 14 *citing* PFF 79.] Not surprisingly, there are a legion of examples from these tens of thousands of documents that fall far outside the purview of Confidential Information. Amongst the documents Roumann cites as "its" Confidential Information are: photographs of T.V. John's advertising signs, letters T.V. John sent to customers like Kroger advising as to how it would finance sub-contractors, photos of job sites, architectural drawings by Kroger's architect, Kroger's logo, T.V. John's safety manual and forms (English and Spanish), and T.V. John's series of Toolbox Talks, which are primers on safety and worksite conduct. (DSAF 153.) Roumann did not create these documents. Roumann never owned these documents. These documents are not Confidential Information.[3] (DSAF 161, 162; Defendants' Response to Plaintiff's PPF 37.)

As Symbiont outlined in its opening brief, Roumann's failure to identify the Confidential Information at issue – the central component of its remaining claims – means that Roumann cannot survive summary judgment, and therefore cannot provide the basis for partial summary judgment in Roumann's favor. It is as unreasonable as it is unrealistic to request that this Court

---

[2] Roumann miscalculated that the number of documents produced was 75,646. The number of documents in the production was 75,616. (DSAF 153.)

[3] These are readily ascertainable, egregious examples. There are many others.

order a declaration of misuse of Confidential Information where Roumann's conception of that term is so vague, arbitrary and broad as to be meaningless.

In addition to the practical unworkability of a judicial declaration concerning Confidential Information, there are also legal barriers to such a declaration.

The Seventh Circuit Court of Appeals addressed a claimant's lack of specificity as to alleged confidential information in the context of a trade secrets claim in *IDX* Systems *Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). Roumann does not contend that the confidential information is a trade secret, but the analysis is still instructive. *See Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 6255689, at *5-7 (E.D. Wis. Dec. 4, 2013) (applying requirements of specificity to trade secret claims, misappropriation of trade secret claims, and breach of confidentiality clause and dismissing each claim at summary judgment).

The Court in *IDX Systems* was critical of the claimant's failure to separate the allegedly protected information from other information, and which pieces of information were the trade secrets. 285 F.3d at 584. The Court rejected the claimant's 43-page description of the processes and inter-relationships among software features as not specific enough to describe the trade secret, finding that the claimant "has been both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret." *Id.* at 583.

That leaves us with Roumann's evolving, expanding, and imprecise conception of Confidential Information. Roumann does not submit anything as detailed as the description proffered in *IDX* Systems (which was itself insufficient). Instead, Roumann points to 75,616 documents, summarily declares them all (save one) as his Confidential Information and leaves it to Symbiont and the Court to make heads or tails of it. The Court simply cannot render

Roumann's requested declaration. "[U]nless the plaintiff engages in a serious effort to pin down the secrets a court cannot do its job." *Id.* It is unfair to even ask the Court to do so.

In its opening brief, Symbiont described the few instances where Rousse did label particular documents shown to him as Roumann's Confidential Information (documents which are not, in actuality, confidential), but otherwise stated that he could not particularly identify any specific piece of Confidential Information unless it was shown to him. (Dkt. 88, 8-12; DSAF 154). Symbiont will not specifically address those documents here, since Roumann does not specifically address them in support of its Motion. However, for the first time, in Rousse's declaration in support of Roumann's motion, Roumann has identified 11 additional documents that it contends were produced as part of the 75,615 documents that make up his Confidential Information. (DSAF 154.) Roumann does not provide the Court copies of these documents, filed under seal or otherwise, but Rousse states that he would be willing to provide them under an *in camera* review. (DSAF 155.)

As a preliminary matter, these documents cannot be considered on summary judgment since they were not specifically identified in discovery, despite Symbiont's multiple requests for Roumann to do so and because Symbiont took Rousse at his word that he could not identify Confidential Information without Symbiont showing him examples. Further, that Roumann does not provide Symbiont or the Court with copies of the documents makes any assertion Roumann has regarding the confidential nature of these documents, unsupported and baseless.

Additionally, while Roumann contends that Symbiont produced the 11 documents itemized (for the first time) in the Rousse declaration, that does not appear to be the case. (DSAF 154, 156.) An extensive search of Symbiont's productions in both this case and the first case to locate these 11 file names that Roumann contends to be Confidential Information turned up no

hits.  (DSAF 156.) Symbiont is not sure what repository of information Rousse was reviewing when he contended that "[Symbiont] also produced my original source lists which predate my termination" and then listed the file names of the relevant documents. However, Symbiont has no reason to believe any of these documents came from its document productions.  Symbiont, and the Court, also have no reason to believe those documents exist, or what they contain, because Roumann has refused to provide copies.

In summary: Symbiont has sought specific identification of what documents constitute Roumann's confidential information – formally and informally – for years.  In response, Roumann has either refused, quoted the Independent Contractor Agreement, stated that every document produced (in each lawsuit) constituted confidential information, and now, provided a list of eleven file names which, so far as we can tell, have never been produced by either party. And all of this comes even though Symbiont specifically sought production and identification of those documents in discovery.[4]

The vague, overly broad conception of Confidential Information that Roumann continues to advance also impacts Symbiont's ability to defend the claims. Without a specific, defined list of what is claimed to be confidential, Symbiont cannot avail itself of the additional defenses available in confidential information cases. For example, with a concrete list Symbiont could point out that certain documents were not even created by Roumann, or were created before Roumann existed, or were created for Symbiont's benefit, or were known to the public, or were not maintained as confidential, as Symbiont has done with the handful of specific documents Roumann has identified. But Symbiont, even after the close of discovery, and even at this late

---

[4] A detailed description of Symbiont's attempts to obtain discovery on the specific items constituting Confidential Information is detailed in Symbiont's Opening Brief in Support of its Motion for Summary Judgment at 7-8, 10-16. (DKT 88.)

hour in the case, continues to be left guessing. This is unacceptable, unworkable, and an illustration as to why the specificity and disclosure requirements exist.

## II.    Roumann has failed to demonstrate that Symbiont accessed the "Confidential Information."

There are further defects with Roumann's request for judicial declaration. In addition to failing to define Confidential Information, Roumann has also failed to demonstrate that Symbiont even used any component of "Confidential Information."  To the contrary, Roumann constructs the following syllogism as the basis for proving improper use of Confidential Information:

- Roumann's Confidential Information was input into Procore (a database).

- Symbiont admits it used Procore.

- Therefore, Symbiont used Roumann's Confidential Information.

The problem with this reasoning is that misstates and misleads as to what Procore is and is not. Procore is a construction management database that houses all manner of construction project documents, including but not limited to information that could be used for bidding. (DSAF 157.) Mr. Rousse admits he has never, to this day, used Procore in any context, and has never used Symbiont's implementation of the Procore product.[5] (DSAF 158.) Roumann has put forth no evidence of any instance where the purported Confidential Information was accessed, nor any instance where its Confidential Information was input into Procore. (DSAF 160.) He only makes broad-based statements in this regard but does not support those statements with any supportive evidence. (DSAF 160.) Therefore, even assuming Symbiont "put" Roumann's Confidential Information into Procore (which also assumes the information is confidential in the

---

[5] Counsel characterized Rousse's experience with Procore differently, contending: "Roumann helped and substantially built a computer software program by putting the information into it that could be used for bidding and for project management during the time they were there." (DSAF 159.)

first place), that does not mean that all future use of Procore constitutes a misappropriation of Roumann's Confidential Information. Taken to its logical conclusion, Roumann's argument on this point means that merely depositing Confidential Information into a location – database, warehouse, file folder – mutates all other information in that database, warehouse, or file folder to become information that is owned by Roumann, and Confidential Information itself. This result has no footing in either the Independent Contractor Agreement or in the law.

This is especially true where the alleged Confidential Information appears on documents undisputedly owned by Symbiont Construction, that is all of the post-bidding documents such as contracts with the client, contracts with the subcontractor, correspondence with both the subcontractor and the clients, change orders, etc., which were also in Procore. (DSAF 161, 162; Defendants' Response to Plaintiff's PPF 37.) Any of Roumann's Confidential Information put into Procore does not render Symbiont's ownership rights with regard to the documents it owned (which contain the exact information Roumann contends is its Confidential Information) impermissible contraband. Such would be an absurd result.

It remains the case that Roumann bears the burden to demonstrate misuse of Confidential Information. At its core, Roumann's argument is that Symbiont misused Confidential Information because Ronald Rousse says so. That methodology is not good enough for an expert witness, and is insufficient for Mr. Rousse, who admits to never having accessed Procore and is in no position to provide admissible testimony as to whether and when any "Confidential Information" was accessed.[6]

---

[6] Here again, if the parties knew what specific documents constituted the alleged "Confidential Information" it would be far easier to discern whether, how, and when they were ever accessed, and for what purpose.

**III.    The Independent Contractor Agreement contemplates the use of Confidential Information to solicit work in the two-year period after termination to generate profits for each party.**

The Plaintiff's memorandum does not address the Independent Contractor Agreement's express provision that each of the party's obligations concerning Confidential Information expire two years after the term of the Agreement. To the extent Roumann is contending that any obligations extend in perpetuity, such an interpretation would be an unenforceable restraint under Wisconsin law. *See Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis. 2d 202, 218, 267, N.W.2d 242 (1978)*. Thus, the focus is on the two-year post termination period.

Roumann now takes the position that the Independent Contractor Agreement did not authorize Symbiont to use Roumann's Confidential Information during the two-year period following termination, notwithstanding the fact that Roumann earned 30% of Net Profit Realized for those projects. As described above, Roumann has not demonstrated that Symbiont actually accessed or used Roumann's Confidential Information in bidding work for Kroger, Fresh Market and Menards during the two-year period following termination, but even if it could so demonstrate, the Agreement expressly authorizes Symbiont to do so.

Section 8.1(a) of the Agreement states that a "Receiving Party" of Confidential Information may use or disclose the information "to the extent necessary to perform its obligations hereunder." Section 4.2(b) provides that Symbiont will pay Roumann 30% Net Profit Realized for any projects completed by Symbiont for Menards, the Fresh Market or Kroger during the two-year period following the effective date of the termination of the Agreement. Roumann is entitled to that 30% Net Profit Realized "whether or not obtained and/or solicited by [Roumann] and accepted by Symbiont."

While the Independent Contractor Agreement does not obligate Symbiont Construction to use Roumann's Confidential Information to bid projects, the Agreement certainly does not prohibit them from using the Confidential Information to bid projects. (DSAF 163.) Indeed, the "essential object" of the post-termination provisions for Roumann was to continue receiving commissions on applicable projects that were bid and won in the two years following the termination of the Agreement and applicable projects in progress at the time of termination. (3/18/22 Rousse Decl. Ex. 2, § 4.2(b).); *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie &Co.*, 206 Wis. 2d 158, 183 (1996). Roumann's contention that TVJ was required to stop using information regarding the applicable clients and any subcontractors is (1) completely inconsistent with Roumann's essential object and would mean that TV John would no longer be able to contact clients or subcontractors on ongoing projects or attempt to bid projects for these clients at all; (2) and inconsistent with its position in the 2017 case that TV John failed to "honestly and diligently pursue new work with Menards, Kroger, and The Fresh Market" which are the clients whose information Roumann now contends is his Confidential Information. (9/20/19 Rousse Decl ¶14, ECF No. 94.)

## IV. Roumann waived any objection or argument that the use of Confidential Information during the two-year period was improper.

To the extent Roumann objected to the use of Confidential Information during the two-year period following termination, it waived any argument to that effect by failing to raise it until well after that period expired and Symbiont had already bid on, and secured, work.

In Wisconsin, waiver is "defined as a voluntary and intentional relinquishment of a known right." *Attoe v. State Farm Mut. Auto. Ins. Co.*, 36 Wis. 2d 539, 545, 153 N.W.2d 575 (1967). Courts focus on the "intent of the party against whom waiver is asserted." *Milas v. Labor Ass'n of Wis., Inc.,* 214 Wis. 2d 1, 10, 571 N.W.2d 656 (1997). The party claiming waiver

need not prove an actual intent to waive, but it must show that the waiving party "had at the time knowledge, actual or constructive, of the existence of his rights or of the facts upon which they depended." *Bade v. Badger Mut. Ins. Co.*, 31 Wis. 2d 38, 46, 142 N.W.2d 218 (1966). Therefore, intention to waive may be "shown by conduct." *Attoe*, 36 Wis. 2d at 545.

Roumann was fully aware that Symbiont possessed whatever it now contends to be Confidential Information, and any ambiguity of Symbiont's intentions to bid on projects was resolved by Symbiont's August 21, 2017 termination letter. Roumann never complained or raised any objection or warning whatsoever that his Confidential Information was not to be used. Instead, both Roumann (through Mr. Rousse) and its counsel stated their expectation and demand that Symbiont pursue work. (DSAF 141-145, 149-152.) Roumann and Rousse also argued, vociferously but unsuccessfully in the predecessor case, that Symbiont was not only authorized but obligated to bid and seek out work from Kroger, the Fresh Market and Menards during the two-year post-termination period. (Case No. 17-CV-1407 (Dkt. 90), 19-21.) Roumann took it even further, arguing that not only was Symbiont obligated to bid, but that it was not doing a good enough job of doing so. (*Id.*)

If Roumann had a legitimate concern and objection to Symbiont bidding and using the so-called Confidential Information during the two-year period, it not only could and should have alerted Symbiont, but it also could have sought an order prohibiting it. Roumann asserted, in this case, a request for injunctive relief as a part of its Fourth Cause of Action (the cause of action on which it now seeks partial summary judgment). (Compl. ¶¶ 122-132.) Roumann never sought any preliminary or expedited relief and instead encouraged Symbiont to seek out the work. It cannot credibly now claim to the contrary and has waived its ability to do so.

## V. Roumann cannot meet the elements of conversion.

As explained in Symbiont's brief in support of its own Motion for Summary judgment, Roumann cannot meet the essential elements for conversion. And no arguments that Roumann makes in its principal brief address the legal deficiencies of the conversion claim, necessitating its dismissal.

As a preliminary matter, Roumann's brief acknowledges that under Wisconsin law, conversion requires a serious interference with the owner's right to possess the property. (*See* Roumann Br. at 26-27, quoting *Midwestern Helicopter* for the elements of conversion.) However, Roumann then ignores that by Mr. Rousse's own admission, Roumann possesses the alleged Confidential Information and has used that information to submit bids. Roumann argues that the fact it was "competing against its own information and data" constitutes an interference with his right to possess the property. However, Roumann provides no citation to support the proposition that this element is expansive enough to encompass alleged interference with rights or perceived benefits beyond the right to actual possession. Indeed, the opposite is true: "conversion of intangible property cannot occur where the plaintiff still has the information which the defendant allegedly appropriated." 18 Am. Jur. 2d Conversion §7; *see also Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1038-39 (D. Minn. 2013).

And this makes sense because in Wisconsin, conversion "is limited to tangible property … and the diversion of money." *Weather Shield Mfg., Inc. v. Drost,* 17 cv-294-jdp, 2018 WL 3824150, at *5 (W.D. Wis. Aug. 10, 2018). With tangible property, interference with the right to possess property inherently means that the owner cannot use the property. With intangible information, where the owner maintains a copy of the information, there is no interference with

the right to possession. *Id.* (alleged misappropriation of customer data, pricing information and strategic plans could not be the basis for conversion as a matter of law.)

Further, the cases Roumann cites in support of its conversion claim offer no help here. While Roumann insists that Symbiont's alleged misuse of Confidential Information can be asserted as a conversion claim, he cites no Wisconsin law for the proposition. Indeed, *Carpenter* was a criminal case that upheld convictions under the federal mail and wire fraud statutes for a reporter's sharing of the Wall Street Journal's stock information prior to publication to affect an insider trading scheme. *Carpenter v. U.S.*, 484 U.S. 19, 22-24 (1987) The Supreme Court upheld those convictions, finding that the sharing of confidential information was a form of misappropriation under the wire and mail fraud statutes. *Id.* at 25-28. There was no common law claim for conversion in this case, under Wisconsin law or otherwise, and so *Carpenter* is inapposite.

So too is *FMC Corp.*, which, while a Seventh Circuit case, discussed conversion in the context of California, not Wisconsin, law. *FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 303 (7th Cir. 1990) Further, in *FMC Corp.* it was undisputed that the plaintiff no longer had possession of any of the alleged confidential business information at issue. *Id.* at 301. Moreover, Court expressly provided that the defendant was permitted to keep copies of the documents and further stated:

> As the district court correctly noted, "the receipt of copies of documents, rather than the documents themselves, should not ordinarily give rise to a claim for conversion." . . . The reason for this rule is that the possession of copies of documents—as opposed to the documents themselves—does not amount to an interference with the owner's property sufficient to constitute conversion. . . . In cases where the alleged converter has only a copy of the owner's property and the owner still possesses the property itself, the owner is in no way being deprived of the use of his property. The only rub is that someone else is using it as well.

*Id.* at 303-04 (Citations omitted). While *FMC Corp.* cites *Carpenter* and notes that *Carpenter's* approach is consistent with the "modern trend of state law" (*id.* at 305), Wisconsin does not follow this modern trend. Indeed, *Weather Shield*, which was decided three decades after *Carpenter* and almost as long after *FMC Corp.*, makes clear that intangible confidential information cannot be the subject of a Wisconsin conversion claim. 2018 WL 3824150, at *5. None of the cases cited in support of *FMC Corp.*'s note regarding this modern trend were decided under Wisconsin law.

The only Wisconsin conversion case Roumann cites, *Midwestern Helicopter*, which it cites mainly for the elements of conversion, involved the conversion of a helicopter, which of course is a tangible item. *Midwestern Helicopter, LLC v. Coolbaugh*, 2013 WI App 126, ¶1, 351 Wis. 2d 211, 839 N.W.2d 167. Nor does *Burbank Grease* apply here—while the Wisconsin Supreme Court left open the possibility for common law tort claims based on the misappropriation of confidential information, conversion was not one of the claims asserted, and the Court did not otherwise hold that a conversion claim is always actionable as a matter of law when it involves confidential information. *Burbank Grease Servs., LLC v. Sokolowski*, 294 Wis. 2d 274, 717 N.W.2d 781 (2006)

Regarding the first element of conversion—a defendant "intentionally control[ing] or tak[ing] property belonging to another"— as fully discussed in Section I(B) of Symbiont's brief in support of its motion for summary judgment, Roumann has not shown that he is the owner of the allegedly Confidential Information. Thus, any issues of control or taking are immaterial. Regarding the second element of lack of consent, while exceeding the authorization of use may satisfy this element, as explained above, Symbiont was authorized to use the allegedly Confidential Information during the two-year post-termination period, by both the terms of the

Independent Contractor Agreement and Roumann's own positions during the two-year time period.

But even if Roumann could meet all the elements of conversion, the claim still could not lie in light of the Independent Contractor Agreement which guides the use of Confidential Information. That is because where a cause of action derives from a contractual relationship, there is no opening for tort liability. *Atkinson v. Everbrite, Inc.*, 224 Wis. 2d 724, 729, 732-33, 592 N.W.2d 299 (Ct. App. 1999). Indeed, "deficient performance of a contract does not give rise to a tort claim." Id. at 729. So even if Symbiont is somehow found to have misused the allegedly Confidential Information, Roumann's relief lies only in a claim for breach of the Independent Contractor Agreement's confidentiality provisions, a claim which it did not bring in this action. Therefore, Symbiont, rather than Roumann is entitled to summary judgment on the issue of liability for conversion, and the claim must be dismissed.

## CONCLUSION

For the reasons stated herein, Roumann is not entitled to partial summary judgment. Roumann has failed to provide the Court or Symbiont a specific, lucid description of what it contends to be its Confidential Information and has offered no evidence supporting its contention that Symbiont misused it. These failures, paired with the existence of the parties' written agreement preclude summary judgment in Roumann's favor.

Dated this 22nd day of April, 2022.

By:  /s/Andrew S. Oettinger
Andrew S. Oettinger
State Bar No. 1053057
Christie B. Carrino
State Bar No. 1097885
Godfrey & Kahn, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone:  414-273-3500
Fax:  414-273-5198
Email:  aoettinger@gklaw.com
         ccarrino@gklaw.com

*Attorneys for Symbiont Defendants*

23